UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
LUIS CEDENO and JUDITH CEDENO,

               Plaintiffs,                            MEMORANDUM
                                                         AND ORDER
      -against-                                  16 CV 796 (RML)

BROAN-NUTONE, LLC,

               Defendant.
--------------------------------------------------X

LEVY, United States Magistrate Judge:

           This diversity products liability action is before me on the consent of the parties,

pursuant to 28 U.S.C. 636(c).  It arises out of an injury sustained by plaintiff Luis Cedeno ("Mr.

Cedeno") as he was installing a range hood designed and manufactured by defendant Broan-

Nutone, LLC ("defendant") in his daughter's home.  Mr. Cedeno alleges that the range hood

dropped on him during installation and that the metal fan scrolling inside of the unit cut and

nearly severed his right hand.  (See Complaint, dated Jan. 12, 2016 ("Compl."), Dkt. No. 1-2.)

He asserts causes of action for negligence and strict liability for design and manufacturing

defects, as well as for failure to warn.  (Id. ¶¶ 31-46.)  He also claims breach of implied and

express warranties.  (Id.)  His wife, plaintiff Judith Cedeno ("Ms. Cedeno"), brings a derivative

cause of action for loss of consortium.  (Id. ¶¶ 47-50.)

           Mr. and Ms. Cedeno ("plaintiffs") commenced this action in the Supreme Court

of the State of New York, Kings County, on January 12, 2016.  (See id.)  The action was

removed to this court, pursuant to 28 U.S.C. § 1441(b), on February 16, 2016.  (See Notice of

Removal, dated Feb. 16, 2016, Dkt. No. 1.)  I held a bench trial on March 5, 6, and 7, 2019, at

which seven witnesses testified: Mr. and Ms. Cedeno; Dr. James Pugh ("Dr. Pugh"), an engineer

specializing in biomechanics and injury; Drs. Nader Paksima and Martin Wolpin ("Dr. Paksima"

and "Dr. Wolpin," respectively), both orthopedic surgeons; Eliot Duncan ("Mr. Duncan"),

defendant's Vice President for Product Safety; and Dr. Bruce Pinkston ("Dr. Pinkston"), a

mechanical engineer specializing in machine design.  (<u>See</u> Trial Transcript, dated Mar. 5-7, 2019

("Tr."), Dkt. No. 44-1.)  Based on the evidence presented at trial, the parties' post-trial

submissions, and the applicable law, I now issue my findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a).[1]  For the reasons stated below, I find in favor

of Mr. Cedeno on the design defect claim in the amount of $900,000 and Ms. Cedeno on the loss

of consortium claim in the amount of $30,000.  After reducing the awards by thirty percent to

account for comparative fault, I award $630,000 to Mr. Cedeno and $21,000 to Ms. Cedeno, for

a total of $651,000.

<b>FINDINGS OF FACT</b>

1. <u>Stipulated Facts</u>

      The parties stipulated to the following facts in their Amended Joint Pretrial Order.

(<u>See</u> Amended Joint Pretrial Order, dated Dec. 11, 2018 ("Am. JTPO"), Dkt. No. 26, at 3-4.)

The accident that is the subject of this litigation occurred on July 26, 2015 at the home of

plaintiffs' daughter in Brooklyn, New York.  (<u>Id.</u> at 3.)  The product at issue is a vented range

hood (the "subject range hood" or the "unit"), designed and manufactured by defendant.  (<u>Id.</u>)

Its model number is CJD330 and its serial number is 031520013124.  (<u>Id.</u>)  As manufactured and

---

[1] To the extent that any finding of fact may be deemed a conclusion of law, it shall be deemed
such a conclusion, and vice versa.  <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 113-14 (1985) (noting the
difficulty, at times, of distinguishing findings of fact from conclusions of law).

sold, it weighs approximately twenty pounds and is thirty inches long on its longest side. (Id.)

Plaintiffs purchased it at retail from Lowes.[2] (Id.)

A range hood is a kitchen appliance, typically installed above a cooking range. (Id.) The purpose of a range hood is to facilitate ventilation during cooking. (Id.) The subject range hood contains a fan, which exhausts fumes and smoke to the outside. (Id.) As designed and manufactured, the subject range hood contains a cover, which prevents internal components from coming into contact with a user when the unit is in place. (Id.) The subject range hood was sold with an instruction manual, which states that installation "must be done by a qualified person(s)." (Id.; see also Instruction Manual, Trial Ex. 6, at Bates Stamp 042.) Mr. Cedeno read the instructions prior to attempting to install the unit and found them to be "totally clear." (Am. JTPO at 3.)

On the day of the accident, Mr. Cedeno was installing the subject range hood in his daughter's kitchen. (Id.) The home was being renovated at the time, and Mr. Cedeno and his brother-in-law, Nelson Santiago ("Mr. Santiago"), were installing the appliances. (Id.) Plaintiffs hired a general contractor to perform certain other tasks. (Id.) Prior to the accident, Mr. Cedeno had positioned the unit on a set of screws above the stove area, where it was intended to be mounted. (Id. at 4.) He had no difficulty lifting it into place. (Id.) He then removed and was carrying it, without the cover in place, when he lost his footing and fell. (Id.) As he fell, the unit slipped from his grip and fell onto him. (See id.) He does not know what precisely caused him to lose his footing. (Id.)

---

[2] Lowe's Companies, Inc., Lowe's Home Centers, Inc., Lowe's Home Centers, LLC, and Lowe's Home Improvement, LCC (collectively, the "Lowe's defendants") were originally parties to this action. (See Compl.) Plaintiffs stipulated to a dismissal without prejudice of all claims against the Lowe's defendants on February 4, 2019. (See Stipulation Amending Caption and Dismissing Certain Parties, dated Feb. 4, 2019, Dkt. No. 27.)

2.  The Subject & Exemplar Range Hoods

According to Mr. Duncan's testimony, most range hoods use either an axial or a centrifugal fan[3] to draw in and release air.  (Tr. at 238:13-22.)  Dr. Pugh explained that a centrifugal fan draws air in sideways, like a waterwheel, whereas an axial fan draws air in directly, like an airplane propeller.  (Id. at 120:14-23.)  The fan scrolling is a piece of metal that surrounds the fan and directs the flow of air.  (Id. at 243:10-13.)  Dr. Pugh testified that the flow of air into a centrifugal fan is less contained than in an axial fan; therefore a centrifugal fan may require more fan scrolling and metalwork.  (Id. at 121:2-5.)  Some axial fans may not utilize fan scrolling at all.  (See id. at 252:21-23.)  Mr. Duncan testified that in any centrifugal fan, the shape of the fan scrolling is very important to overall functionality.  (Id. at 243:10-244:2.)

### a.  The Subject Range Hood

The subject range hood is a part of defendant's Allure line and was designed primarily for sale at Lowes.  (Id. at 241:5-12.)  It contains a centrifugal fan, surrounded by galvanized steel fan scrolling.  (Id. at 244:3-245:1; see also Subject Range Hood, Trial Ex. 1.)  As discussed above, it was manufactured and sold with a cover, which prevents internal components from coming into contact with a user when the unit is in place.  (Am. JTPO at 3.)  According to the instruction manual, the cover must be removed for installation.[4]  (See Instruction Manual, Trial Ex. 6, at Bates Stamp 044.)  Both Mr. Cedeno and Dr. Pugh testified

---

[3] A centrifugal fan may also be referred to as a "centrifugal blower" or a "squirrel cage blower." (Tr. at 238:19-21.)

[4] At trial, Mr. Duncan testified that the cover should be in place during installation.  (Tr. at 251:14-16.)  However, his testimony is contradicted by the instruction manual itself, which clearly directs the user to remove the cover in preparation for installation and to replace it only once the unit has been screwed into place above the cooking range.  (See Instruction Manual, Trial Ex. 6, at Bates Stamps 044-46.)  The manual even contains pictures of individuals working on the inside with bare hands and the cover removed.  (Id. at 045.)

that the keyholes through the which the unit attaches to a wall or cabinet are located on the inside of the unit and cannot be accessed with the cover in place.  (See Tr. at 43:13-19, 129:2-8.)

Dr. Pugh testified that the edge of the fan scrolling is sharp enough to slice a sheet of copy paper, and that this capability indicates a sharpness level of approximately 350.[5]  (Id. at 108:11-109:2.)  He further testified that a sharpness level of 350 is "equivalent to . . . the sharpness of a household knife that has not been prepared, has not been honed, has not been tended to regularly, but which is usable in the kitchen . . . to cut meat, to cut vegetables."  (Id. at 109:4-7.)  Dr. Paksima, plaintiffs' medical expert, testified that the nature of Mr. Cedeno's injury, which he described as "a sharp laceration" with little collateral tissue damage, spoke to the sharpness of the object that caused it.  (Id. at 219:1-16.)  Dr. Pinkston, defendant's mechanical engineering expert, admitted that the object that caused plaintiff's injury had to have been sharp.  (Id. at 341:2-4.)

It was Dr. Pugh's opinion that the sharpness of the fan scrolling posed a danger to a user installing the subject range hood because the edges are unprotected and because one would not ordinarily expect there to be sharp edges on the inside of the unit.  (Id. at 112:11-25.)  He further testified that the sharp edges could have been covered, rolled, flattened, or folded without any noticeable effect on the machine's functionality.  (Id. at 113:2-114:7, 126:4-127:4.)  Dr. Pinkston agreed that each of Dr. Pugh's proposed safety measures was feasible, though potentially costlier.  (See id. at 335:3-10, 341:5-18.)  The subject range hood and cover, both introduced into evidence at trial as Exhibit 1, are pictured separately below:

---

[5] Dr. Pugh did not state which scale of measurement he was referring to when he testified that the sharpness level of the scrolling was approximately 350, but presumably he was applying the Brubacher Edge Sharpness Scale ("BESS").



*Exhibit 1: The Subject Range Hood*



*The Cover*

### b. The Exemplar Range Hoods

In addition to the subject range hood, plaintiffs introduced into evidence two exemplar range hoods, the Nutone[6] and the Zephyr, both of which contain axial fans encased

---

[6] The Nutone range hood is also referred to in the testimony as the Mantra. (<u>See</u> Tr. 252:3-6.)

within a metal or plastic covering.  (Id. at 119:21-120:14, 123:3-6.)  The Nutone, which was designed and manufactured by defendant (id. at 119:22-25), does not contain scrolling at all (id. at 252:21-23).  Rather, it uses a galvanized steel "air box" to direct the flow of air.  (Id. at 252:23-253:1.)  The internal components are housed within the air box, so that they are not exposed to the user.  (See Nutone Range Hood, Trial Ex. 2.)  The Zephyr similarly employs plastic cowling to encase its fan and internal components.  (See Tr. at 123:3-6, 254:20-21; see also Zephyr Range Hood, Trial Ex. 3.)  The Nutone and the Zephyr, introduced into evidence at trial as Exhibits 2 and 3, respectively, are pictured below:



*Exhibit 2: The Nutone*



*Exhibit 3: The Zephyr*

Mr. Duncan testified that two important considerations in designing a range hood are efficiency and sound, the goal being to move as much air possible with as little noise as possible.  (See id. at 239:3-16.)  Dr. Pugh testified that a range hood with an axial fan can be designed to be even quieter than one with a centrifugal fan, while maintaining the same level of efficiency.  (Id. at 121:19-122:17.)  He further testified that the materials and processes necessary to produce both exemplars were available at the time that the subject range hood was designed and manufactured.  (Id. at 121:7-10, 123:7-10.)  While Mr. Duncan testified that the Nutone is louder than the subject range hood. (id. at 252:18), it was Dr. Pinkston's opinion that a typical consumer would not notice a difference in ordinary operation between a range hood using a centrifugal fan and one using an axial fan (see id. at 351:20-23).

3.  The Accident

On the day prior to the accident, Mr. Cedeno and Mr. Santiago read and discussed the instruction manual in its entirety, and planned for the installation.  (Id. at 39:20-40:5.)  They further prepared for the installation by fitting the unit into the wall and preparing the mounting

holes.  (See id. at 40:20-24; 43:23-44:6.)  The general contractor had previously installed the wiring.  (Id. at 40:6-12.)  Mr. Cedeno testified to his own background as an auto mechanic and as a pinball machine, copy machine, and computer technician.  (See id. at 29:5-32:23.)  Based on his professional background, as well as his prior experience installing a range hood at his brother's home, he felt qualified to perform the installation.  (Id. at 34:17-35:9.)

On the following day, the day of the accident, Mr. Cedeno hung the unit in the space where it was to be installed to ensure that it fit properly.  (Id. at 45:3-12.)  Once he was satisfied that it fit, he removed the unit, stepped backwards, and turned towards the counter to place it down.  (Id. at 45:13-18.)  As he was placing the unit down, he lost his footing and fell.  (Id. at 45:19-20.)  As he fell, he lost his grip on the unit and it dropped from a height of approximately one foot onto his arm and a portion of his chest.  (Id. at 46:1-3, 57:11.)  He testified that he is unsure which portion of the unit cut him, but believes that it was the fan scrolling.  (See id. at 57:15-58:15.)

Mr. Cedeno was working alone with the unit at the time (see id. at 45:4-5), though his sister-in-law, Elizabeth Santiago ("Ms. Santiago"), was in the room and witnessed the accident (see Transcript of Deposition of Elizabeth Santiago, dated Jan. 11, 2018 ("Santiago Dep. Tr."), Trial Ex. 14, at 11:25-12:6).  He testified that he is not prone to falls, did not feel dizzy, and was not taking any medications that would have affected his balance.  (Tr. at 56:20-57:3.)  He further testified that he was wearing sneakers at the time of the accident and that the floor was free of any debris that could have tripped him.  (Id. at 56:17-19, 87:2-18.)

4. Plaintiffs' Injuries

### a. Mr. Cedeno

Mr. Cedeno's treating surgeon, Dr. Robert Hotchkiss, described Mr. Cedeno's injury in his notes as a "near amputation." (Dr. Hotchkiss' Records, Trial Ex. 12, at Bates Stamps 001, 003.) According to the medical records introduced into evidence at trial, as well as the testimony of Dr. Paksima, the laceration extended from skin to bone, severing veins, muscles, seven tendons,[7] the right wrist ligation branch of the radial artery, the superficial radial nerve, and the capsule of the wrist joint.[8] (See id. at Bates Stamps 036-038; Tr. at 209:2-210:1, 219:15-16.) Dr. Paksima further testified that there was little collateral tissue damage, which indicates a "clean cut." (Tr. at 219:1-16.) The injury was to his right hand, which is his dominant hand. (Id. at 70:7-10.)

Immediately following the accident, Mr. Cedeno was treated at the emergency room of Mount Sinai Hospital, Brooklyn. (Id. at 47:1-48:10; Mount Sinai Emergency Room Records, Trial Ex. 8.) He was bleeding profusely and lost a large amount of blood on the way to the hospital. (Id. at 47:3-8.) Once the bleeding was controlled, he was transferred to Kings County Hospital. (Id. at 48:2-17; Kings County Hospital Records, Trial Ex. 9.) The following day, he underwent surgery at the Hospital for Special Surgery to repair the damaged structures in his wrist and hand. (Id. at 49:10-24.) During the time between the accident and his surgery, Mr.

---

[7] According to the post-operative report, the following tendons were severed: (1) the right extensor carpi radialis brevis (ECRB); (2) the right extensor carpi radialis longus (ECRL); (3) the right extensor digitorum communis (EDC); (4) the right extensor indicis proprius (EIP); (5) the right extensor pollicis longus (EPL); (6) the right abductor pollicis longus (APL); and (7) the right extensor pollicis brevis (EPB). (See Dr. Hotchkiss' Records, Trial Ex. 12, at Bates Stamp 036; see also Diagram of Extensor Tendons, Trial Ex. 16.)

[8] The capsule is a watertight compartment which holds the joint fluid. (Tr. at 209:18-20.)

Cedeno testified that he experienced "excruciating" pain. (Id. at 59:14-60:8.) Following his surgery, Mr. Cedeno underwent approximately eight to nine months of physical therapy, continuing until he reached the maximum level of improvement. (Id. at 65:23-66:2, 220:3-7.)

As a result of his injury, Mr. Cedeno continues to experience a number of physical limitations, including loss of grip strength, loss of web space between his thumb and index finger,[9] and a decreased range of motion. (Id. at 200:21-205:19.) Due to the damage to his superficial radial nerve, he also has a loss of sensation in his right hand, as well as an increased sensitivity to cold. (Id. at 197:14-200:20.) At a practical level, he has difficulty picking up and holding objects, particularly small ones, and has decreased stamina in his right hand. (Id. at 70:11-24; 221:3-8.) He can no longer engage in certain recreational activities that he once enjoyed, such as playing his guitar. (Id. at 70:24-71:5.) He also has difficulty working with circuit boards, which was previously a hobby of his. (Id. at 70:14-22.) The loss of sensation makes him vulnerable to injury, since he may not be able to feel a cut or burn. (Id. at 198:5-8.) He also continues to experience pain, which he relieves using topical analgesics such as Icy Hot. (Id. at 221:5-6.) Dr. Paksima testified that these changes are likely to be permanent. (Id. at 223:15-20.)

### b. Ms. Cedeno

Ms. Cedeno was at Lowe's when the accident occurred; therefore she did not witness the accident. (Id. at 169:11-15.) She first found out about the accident when she received a phone call from Ms. Santiago, saying that Mr. Cedeno was hurt badly, was bleeding, and was taken to the emergency room (Id. at 169:19-170:1.) After receiving the phone call, she

---

[9] Web space refers to the space between an individual's fingers. (Tr. 202:17-20.) An individual with decreased web space will not be able to fully open his or her hand to grasp objects. (Id. at 202:20-203:3.)

immediately left the store and went to the hospital. (Id. at 170:3-6.) As she walked towards the building, she noticed a trail of blood, which turned out to be Mr. Cedeno's. (Id. at 170:10-18.) When she entered Mr. Cedeno's hospital room, she found him covered in blood and making pained sounds. (Id. at 171:6-9.) She testified that when she first saw his hand, it did not look like it was part of his body. (Id. at 175:2-8.)

In the months following the accident, Ms. Cedeno assumed the role of caregiver for her husband. (Id. at 177:12-18.) She administered his medications and helped him with bathing and feeding. (Id.) She also had to take responsibility for household chores that Mr. Cedeno would ordinarily have done. (Id. at 178:1-5.) While Ms. Cedeno is now retired (id. at 165:22-24), she was still working at the time and therefore had to balance her professional responsibilities with caring for her husband (id. at 177:24-178:5). She described this period as extremely stressful. (Id. at 177:25.) Ms. Cedeno initially attended her husband's physical therapy sessions, but had to stop because it was too difficult to see him in pain. (Id. at 178:23-179:7.) She also testified to a lack of intimacy and to her husband's increased irritability in the approximately six months following the accident. (Id. at 180:17-181:3.) While her relationship with her husband has largely returned to normal, she testified that today he is "a little more irritable and a little more lack[ing] [in] patience" than he was before the accident. (Id. at 181:6-7.) However, she testified she could not be sure that this increased irritability is attributable to his injury, since "[h]e's not the type to tell me" when he is in pain. (Id. at 181:8-10.)

## CONCLUSIONS OF LAW

1. Liability

Under New York law, which applies in this diversity action, there are four theories under which a plaintiff may pursue recovery against a manufacturer based upon a claim

of products liability: (1) strict liability; (2) negligence; (3) breach of express warranty; and (4) breach of implied warranty. Oden v. Boston Sci. Corp., 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018); Lara v. Delta Int'l Mach. Corp., 174 F. Supp. 3d 719, 740 (E.D.N.Y. 2016). In order to prevail under any of these theories, a plaintiff must show that the product at issue was defective and that the defect was the actual and proximate cause of plaintiff's injury. Lara, 174 F. Supp. 3d at 740 (citing Voss v. Black & Decker Mfg. Co., 450 N.E.2d 204, 208-09 (N.Y. 1983)). New York law recognizes three types of product defects: (1) design defects; (2) manufacturing defects; and (3) defective or inadequate warnings. Voss, 450 N.E.2d at 207; McCarthy v. Olin Corp., 119 F.3d 148, 154-55 (2d Cir. 1997). Plaintiffs in this case allege all three types of defect, and assert their design and manufacturing defect claims under theories of both strict liability and negligence.

### a. Design Defect

A defectively designed product is "one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." Scarangella v. Thomas Built Buses, 717 N.E.2d 679, 681 (N.Y. 1999) (internal quotation marks omitted). In order to establish a *prima facie* case of design defect under New York law, a plaintiff must show that: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing the plaintiff's injury. Oden, 330 F. Supp. 3d at 888; Lara, 174 F. Supp. 3d at 740. New York courts treat design defect claims sounding in either negligence or strict liability as functionally

synonymous; therefore they may be analyzed concurrently using the same elements.[10] Oden, 330 F. Supp. 3d at 887; see also Adams v. Genie Indus., 929 N.E.2d 380, 384 (N.Y. 2010).

Taken together, the first two elements function as a risk-utility balancing test, which is used to determine whether the product is unreasonably dangerous. See Trisvan v. Heyman, 305 F. Supp. 3d 381, 404 (E.D.N.Y. 2018). The relevant question is "whether . . . if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." Adams, 929 N.E.2d at 384 (quoting Voss, 450 N.E.2d at 108); see also Trisvan, 305 F. Supp. 3d at 404. In Voss, the New York Court of Appeals articulated a non-exclusive list of factors that may be considered in making this determination:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

450 N.E.2d 208-209; see also Fasolas v. Bobcat of N.Y., 128 N.E.3d 627, 633 (N.Y. 2019).

Taking into account these factors, I find that plaintiffs have established by a preponderance of the evidence that the design of the subject range hood was unreasonably

---

[10] In 2002, the Second Circuit characterized "the degree of overlap between negligence and strict liability for design defects" as being "unsettled" because the New York Court of Appeals had not ruled directly on the issue. See Jarvis v. Ford Motor Co., 283 F.3d 33, 62 (2d Cir. 2002). More recently, it has recognized that "New York courts generally consider strict products liability and negligence claims to be functionally synonymous." See S.F. v. Archer Daniels Midland Co., 594 F. App'x 11, 12 (2d Cir. Dec. 11, 2014) (summary order) (quoting Goldin v. Smith & Nephew, Inc., No. 12 CV 9217, 2013 WL 1759575, at *6 (S.D.N.Y. Apr. 24, 2013)).

dangerous, and therefore have satisfied the first two prongs of the *prima facie* case. The court finds credible Dr. Pugh's testimony that the fan scrolling is approximately as sharp as a dull kitchen knife. (See Tr. at 109:4-7.) Given (1) the downward-facing orientation of the fan scrolling (see Subject Range Hood, Trial Ex. 1), (2) the necessity of installing the unit at a height (see Tr. at 127:5-13), (3) the fact that the instruction manual expressly states that the cover must be removed for installation (see Instruction Manual, Trial Ex. 6, at Bates Stamp 044), and (4) the fact that a user must place his or her hands inside of the unit and in close proximity to the fan scrolling in order to access the keyholes (see Tr. at 43:13-19, 129:2-12), the court finds that the design of the unit created a substantial and foreseeable risk that the unit could fall on a user during installation and that the fan scrolling could cut him or her. Moreover, through the expert testimony of Dr. Pugh, plaintiffs established that a safer design employing an axial fan was both available and feasible at the time the subject range hood was manufactured. (See Tr. at 121:7-124:24.) Plaintiffs also established that the existing design, using a centrifugal fan, could have been modified to be made safer by covering, folding, flattening, or rolling the sharp edge, and that doing so would have been both feasible and economical at the time of manufacture. (See id. at 124:24-127:4.)

       I also find that the design of the subject range hood was an actual and proximate cause of Mr. Cedeno's injury. Under New York law, actual causation is present where, but for the act or omission at issue, the plaintiff's injury would not have occurred. See Sawyer v. Wight, 196 F. Supp. 2d 220, 227 (E.D.N.Y. 2002). Proximate causation is present where the act or omission at issue was a substantial factor in causing the plaintiff's injury. See id.; see also Voss, 450 N.E.2d at 110 ("The tie which proximate cause is to provide . . . must be between the design defect of the product and the injury—that is, the plaintiff must show that the design defect in the

product was a substantial factor in causing his injury.") There may be more than one substantial factor, and thus more than one proximate cause, involved in causing an injury. See Barban v. Rheem Textile Sys., No. 01 CV 8475, 2005 WL 387660, at *8 (E.D.N.Y. Feb. 11, 2005). "Plaintiff need not demonstrate . . . that the precise manner in which the accident happened, or the extent of injuries, was foreseeable." Derdiarian v. Felix Contracting Corp., 414 N.E.2d 666, 670 (N.Y. 1980). However, where the actions of either a third person or the plaintiff intervene between the defendant's conduct and the injury, the plaintiff must show that the intervening acts were "a normal and foreseeable consequence of [the] defendant's conduct." Henry-Lee v. City of New York, 746 F. Supp. 2d 546, 571 (E.D.N.Y. 2010).

Multiple witnesses testified at trial that, had the sharp edges inside of the unit been protected, the accident would not have resulted in the near-amputation of Mr. Cedeno's hand. (See Tr. at 122:18-124:5, 281:10-14; 336:10-20.) Having inspected both the subject range hood and the two exemplar range hoods, the court agrees; therefore, I find that the design of the subject range hood was an actual and substantial cause of Mr. Cedeno's injury. While defendant argues that it was not reasonably foreseeable that a person would drop the unit onto his or her hand with the cover removed (see Defendant's Proposed Findings of Fact & Conclusions of Law, dated Apr. 21, 2019 ("Def.'s Post-Tr. Br."), Dkt. No. 43, at 16), for the reasons explained above, the court disagrees. The unit had to be installed at a certain height and without the protective cover. Therefore, I find that plaintiffs have met their burden in showing actual and proximate causation. Because I find liability on the design defect claim, I make no finding on manufacturing defect or failure to warn.

### b. Comparative Fault

Defendant raises the affirmative defense of comparative fault which, in New York, is available "[i]n any action to recover damages for personal injury," including one brought under a theory of strict liability.  N.Y. C.P.L.R. § 1411; Arbegast v. Bd. of Educ. of S. New Berlin Cent. Sch., 480 N.E.2d 365, 370 (N.Y. 1985); Gottesman v. Graham Apartments, Inc., No. 65447/2011, 2015 WL 1839746, at *29 (N.Y. Civ. Ct. Apr. 5, 2015).  New York is a pure comparative fault jurisdiction; therefore "the culpable conduct attributable to the claimant . . . shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished . . . proportion[ally]."  N.Y. C.P.L.R. § 1411; see also Korean Air Lines Co. v. McLean, 118 F. Supp. 3d 471, 491 (E.D.N.Y. 2015).

"Culpable conduct" refers not only to negligent conduct, but any "conduct which, for whatever reason, the law deems blameworthy."  Arbegast,  450 N.E.2d at 370.  For this reason, the New York Court of Appeals has stated that "comparative causation" is a more accurate description of the process of assigning fault.  Id.  It has further stated that the finder of fact should analyze comparative fault from a "holistic perspective," considering "the culpable conduct attributable to the [plaintiff as] compared with the total culpable conduct which caused the damages" and "fix[ing] the relationship of each party's conduct to the injury sustained." Rodriguez v. City of New York, 101 N.E.3d 366, 377 (N.Y. 2018) (quoting Arbegast, 480 N.E.2d at 370-71); see also Integrated Waste Servs., Inc. v. Azko Nobel Salt, Inc., 113 F. 3d 296, 300 (2d Cir. 1997) ("[L]iability is split between plaintiffs and defendants based on the relative culpability and causal significance of their conduct." ) (footnote omitted).

In this case, the court has already determined that the defective design of defendant's product was a substantial factor in causing Mr. Cedeno's injury.  The court now

finds that Mr. Cedeno's tripping and dropping the unit was an additional substantial factor in causing his injury. The exact reason that Mr. Cedeno tripped and fell is an enduring question in this case, and one to which we may never know the answer. Mr. Cedeno testified at trial that, as he backed away from the stove area and began to turn towards the counter, his "feet got caught up somehow." (Tr. at 45:13-18.) He does not know what precisely caused him to trip. (Id.; see also Am. JTPO at 4.) He testified that he was wearing appropriate footwear at the time of the accident and that the floor was clear of any debris that could have tripped him. (Tr. at 56:17-19, 87:2-18.) He also testified that he is not prone to falls, did not feel dizzy, and was not taking any medications that would have affected his balance. (Id. at 56:20-57:3.) The only witness to the accident was Ms. Santiago, whose testimony adds little clarity to Mr. Cedeno's account. (See Santiago Dep. Tr. at 12:17-18) ("He had it out, and then he was backing up, and the next thing I know, he fell.").) While we do not know what caused Mr. Cedeno to trip, liability for the portion of the damages attributable to his tripping must fall somewhere. I find that it would be unfair for it to fall entirely on defendant, and thus it is appropriate to apportion fault in this case. In recognition of the care with which Mr. Cedeno approached the entirety of the installation process, while also acknowledging the critical causal role that his tripping played in causing his injury, I assign seventy percent of the total fault to defendant and thirty percent to Mr. Cedeno.[11]

---

[11] I do not assign any fault to Mr. Cedeno for carrying the unit without a cover. As previously discussed, the removal of the cover was necessary for installation and Mr. Cedeno was in the process of installing the unit when the accident occurred. (See Tr. at 43:13-19, 129:2-12.) Even defendant's expert, Dr. Pinkston, stated that he would not fault Mr. Cedeno for moving the unit without the cover in place because "[i]t is not an obvious thing to do." (Id. at 344:12-25.)

2. Damages

   *a. Mr. Cedeno*

   Mr. Cedeno seeks an award of $1 million to $1.2 million for past and future pain and suffering, including loss of enjoyment of life. (See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated Apr. 22, 2019 ("Pls.' Post-Tr. Br."), Dkt. No. 44, ¶ 28.) He suggests a distribution of $550,000 for past pain and suffering and $500,000 for future pain and suffering. (Id.) He does not seek damages for loss of income[12] or medical expenses. (See id.)

   Damages for pain and suffering are difficult to quantify and vary greatly depending on the facts and circumstances of each case. In fashioning an appropriate award, courts typically consider the decisions of other courts and jury verdicts involving similar injuries. Glassman-Brown v. Pouring Wine, LLC, No. 14 CV 3763, 2016 WL 1358585, at *2 (S.D.N.Y. Feb. 29, 2016), report and recommendation adopted, 2016 WL 1367230 (S.D.N.Y. Apr. 5, 2016). Plaintiffs' counsel has submitted one citation to a court decision and one citation to a jury verdict for the court's consideration.[13] See Harris v. City of New York, 770 N.Y.S.2d 380, 381-82 (2nd Dep't 2003) (reducing jury award of $500,000 for past pain and suffering and $550,000 for future pain and suffering to $200,000 ($278,867.39 adjusted for inflation[14]) and $350,000 ($488,017.93 adjusted for inflation), respectively, for a twenty-nine year-old with an injury to the

---

[12] Mr. Cedeno was retired at the time of the accident. (See Tr. at 4:8-9; 224:12-13.)

[13] Both parties have additionally submitted a number of settlement figures for the court's consideration. Because settlement figures may take into account factors other than reasonable compensation, the court does not find the settlement figures submitted by the parties to be instructive in fashioning an appropriate damages award. See Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 500-01 (S.D.N.Y. 2013) ("Under New York law . . . courts look to approved awards in similar cases as guideposts in fashioning appropriate damages awards.")

[14] To ensure accurate valuation of prior awards, I have adjusted for inflation where a prior award is more than six years old, i.e., issued prior to 2013.

primary tendon in his right wrist, who underwent successful reconstructive surgery, but continued to experience pain, weakness, numbness, and loss of motion); Lockwood v. Hilbert College, No. 168/96, 1997 WL 850374 (Sup. Ct. Erie Cty. Nov. 18, 1997) (jury award of $550,000 for pain and suffering ($879,170.72 adjusted for inflation) to a ten year-old with severe lacerations to both wrists and arms, which resulted in nerve, tendon, and artery damage and required surgery and extensive rehabilitation). Defendant submits an additional jury verdict. See Piccione v. 1165 Park Ave., Inc., No. 2790/92, 1999 WL 35218763 (Sup. Ct. N.Y. Cty. Nov. 19, 1999) (jury award of $325,000 ($500,488.30 adjusted for inflation) for past pain and suffering to twenty-nine year-old plaintiff with blunt force trauma to his dominant hand and wrist, which required eight surgeries).

In addition to the citations provided by the parties, the court has surveyed pain and suffering awards in other cases involving arm, wrist, and hand injuries, including the following: Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 508 (S.D.N.Y. 2013) (awarding $1,266,000 for past pain and suffering and $1,435,140 for future pain and suffering, based on a projected life expectancy of fifty-one years, to a cruise passenger who suffered permanent injuries to both arms in accident with intoxicated speedboat driver, losing significant functionality); Villatoro v. Sullivan, No. 7781/11, 2014 Jury Verdicts LEXIS 10754 (Sup. Ct. Nassau Cty. Oct. 29, 2014) (jury award of $450,000 for past pain and suffering and $550,000 for future pain and suffering, based on a projected life expectancy of forty-four years, in a medical malpractice case where a nerve in plaintiff's dominant arm was accidentally lacerated during surgery, requiring one additional surgery and resulting in residual pain and reduced functionality of the hand and wrist); Abreu v. Wel-Made Enters., No. 36405/07, 2014 Jury Verdicts LEXIS 10290 (Sup. Ct. Kings Cty. Oct. 16, 2014) (jury award of $1.4 million for past pain and suffering

and $750,000 for future pain and suffering to a fifty-one-year old diesel mechanic whose dominant hand and wrist were injured by a piece of metal protruding from the mixing barrel of a cement truck, fracturing bone and lacerating a branch of the radial artery, as well as muscle, ligament, nerve, and multiple tendons; plaintiff required two surgeries and physical therapy, and suffered residual pain, reduced range of motion, reduced grip strength, and difficulty holding and lifting objects); Diouf v. New York City Transit Auth., 909 N.Y.S.2d 451, 452 (1st Dep't 2010) (upholding jury award of $800,000 for future pain and suffering ($941,255.46 adjusted for inflation) to fifty-five year-old tailor who broke both wrists as the result of a slip-and-fall, requiring two surgeries and resulting in reduced range of motion, ongoing tenderness, reduced grip strength, and traumatic arthritis); Nutley v. New York City Transit Auth., 913 N.Y.S.2d 694, 695 (2d Dep't 2010) (upholding jury award of $300,000 ($352,970.80 adjusted for inflation) for past pain and suffering and $200,000 ($235,313.86 adjusted for inflation) for future pain and suffering to plaintiff who suffered injury to his dominant hand and wrist as the result of a slip-and-fall, requiring surgery and resulting in residual pain, numbness, tingling, loss of strength, and reduced range of motion); Karwacki v. Astoria Med. Anesthesia Assocs., P.C., 808 N.Y.S.2d 123, 124 (2d Dep't 2005) (upholding jury award of $200,000 ($262,732.21 adjusted for inflation) for past pain and suffering and $400,000 ($525,464.41) for future pain and suffering to plaintiff who fell from a ladder and broke his dominant wrist, requiring two surgeries and resulting in permanent nerve damage, traumatic arthritis, residual pain and weakness, reduced range of motion, and reduced grip strength in some fingers); Keefe v. E & D Specialty Stands, Inc., 708 N.Y.S.2d 214, 215 (4th Dep't 2000) (upholding jury award of $1 million ($1,489,883.86 adjusted for inflation) for future pain and suffering, based on a life expectancy of forty years, to a plaintiff who suffered a laceration to his ulnar nerve while performing iron work,

resulting in permanent loss of feeling in his dominant hand and a fifty percent loss of strength in that hand); Yanez v. Kasenetz, 705 N.Y.S.2d 588, 589 (1st Dep't 2000) (upholding jury award of $87,500 ($130,364.84 adjusted for inflation) for past pain and suffering and $250,000 ($372,470.96 adjusted for inflation) for future pain and suffering, based on a life expectancy of thirty-five years, to a laborer who suffered injury to the radial, medial, and ulnar nerves in his right arm, resulting in fatigue if he used the arm for a prolonged period of time, an inability to lift heavy objects, and a tendency to drop things from his right hand; plaintiff additionally could no longer engage in many activities he previously enjoyed); see also De La Cruz v. New York City Transit Auth., No. 17523/202, 2006 WL 1112958, at *5 (Sup. Ct. Queens Cty. 2006) (reducing jury award of $2.5 million for past pain and suffering and $12.5 million for future pain to $1 million ($1,272,609.13 adjusted for inflation) and $2 million ($2,545,218.25 adjusted for inflation), respectively, for a twenty-nine year-old woman who was struck by a bus, which crushed her right foot, leaving it disfigured, virtually useless, and extremely painful).

Given the unique nature of Mr. Cedeno's injury, the court has also surveyed cases involving amputations, including the following: Hwang v. Grace Road Church, 14 CV 7187, 2018 WL 4921638, at *7 (E.D.N.Y. Aug. 10, 2018) (awarding $1 million for past pain and suffering and $1.65 million for future pain and suffering, based on a life expectancy of thirty-three years, to a plaintiff who lost his leg above the knee and suffered severe mental anguish as the result of an assault and battery); Villalba v. Rockford Sys., Inc., No. 02 CV 4455, 2006 WL 526660, at *5 (E.D.N.Y. Mar. 3, 2006) (awarding $50,000 for past pain and suffering ($63,630.46 adjusted for inflation) and $50,000 (same) for future pain and suffering for the partial loss of two digits on plaintiff's dominant hand, where the treating doctor's prognosis was that he would regain function in the injured hand and be able to lead a relatively normal life);

Marin v. New York City Health & Hosps. Corp., 43 N.Y.S.3d 289, 290 (1st Dep't 2016) (upholding jury award of $2 million for past pain and suffering and $4 million for future pain and suffering over thirty years, in malpractice action where plaintiff provided evidence that his amputated leg could have been saved following car accident); Nunez v. Levy, No. 114538/03, 2008 WL 2219892, at *12 (Sup. Ct. N.Y. Cty. 2008) (reducing jury award of $5 million for past pain and suffering and $5 million for future pain and suffering to a twenty-five year-old man who lost his leg below the knee as a result of a work accident in which a vault door fell on his foot to $2.5 million ($2,979,034.20 adjusted for inflation) and $4 million ($4,766,454.72 adjusted for inflation), respectively).

Pain and suffering "does not lend itself to neat mathematical calculation." Caprara v. Chrysler Corp., 417 N.E.2d 545, 551 (N.Y. 1981). New York courts typically award damages for past pain and suffering based on "the medical procedures endured and nature of the injury suffered." House v. Kent Worldwide Mach. Works, Inc., 359 F. App'x 206, 209 (2d Cir. 2010) (summary order). Damages for future pain and suffering, on the other hand, are calculated in part by reference to actuarial tables to determine the plaintiff's projected life span. Id. In calculating an award for future pain and suffering, the factfinder should "determin[e] the sum that the plaintiff should have now as compensation for the pain and suffering he will endure." Oliveri v. Delta S.S. Lines, Inc., 849 F.2d 742, 751 (2d Cir. 1988).

Mr. Cedeno is currently sixty-five years old. (See Tr. at 27:1; Plaintiffs' Reply to Defendant's Proposed Findings of Fact & Conclusions of Law, dated Apr. 29, 2019, Dkt. No. 45, at 2.) Therefore, his life expectancy is approximately eighteen years, based on the relevant

actuarial table.[15]  According to the medical records admitted into evidence at trial, he additionally suffers from type 2 diabetes, hepatitis C, and cirrhosis of the liver (see Hospital for Special Surgery Records, Trial Ex. 10, at Bates Stamps 02, 056), which defendant asserts could potentially shorten his life span.  (Def.'s Post-Tr. Br. at 6.)  However, neither party presented evidence at trial or in their post-trial submissions that would allow the court to estimate the impact that these conditions could have on his life span.  Therefore, I will presume a life span of eighteen years, per the actuarial table.

As described above in my findings of fact, Mr. Cedeno suffered a gruesome injury, requiring surgery and physical therapy.  The court heard testimony as to the "excruciating" pain he endured and the permanent physical limitations that continue to reduce the functionality of his hand.  Taking into account the relevant standards for determining pain and suffering damages, the evidence presented at trial, and the above cited cases, I value Mr. Cedeno's damages for past pain and suffering at $500,000 and his damages for future pain and suffering at $400,000, for a total of $900,000.  After apportioning the damages to account for thirty percent comparative fault, I award Mr. Cedeno a total of $630,000.

### b.  Ms. Cedeno

Ms. Cedeno seeks an award of $100,000 to $150,000 for loss of consortium.  (See Pls.' Post-Tr. Br. ¶ 30.)  She suggests a distribution of $80,000 for past loss of consortium and

---

[15] See United States Department of Health and Human Services, National Vital Statistics Report, Vol. 68, No. 7, published June 24, 2019, available at: https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf; see also House, 359 Fed. App'x at 209 (concluding that the National Vital Statistics Report is a self-authenticating document under Federal Rule of Evidence 901).  I have not considered plaintiff's race or ethnicity, as "[r]ace-based statistics and other race-centric data cannot be relied upon" in calculating life expectancy for a claimant in computing tort damages. See G.M.M. ex rel. Hernandez-Adams v. Kimpson, 116 F. Supp. 3d 126, 140 (E.D.N.Y. 2015).

$50,000 for future loss of consortium. (Id.) "It is well settled under New York law that a claim for loss of consortium is a derivative action and, as such, its viability is dependent on the viability of a primary cause of action." Dockery v. United States, 663 F. Supp. 2d 111, 125 (N.D.N.Y. 2009) (internal quotation marks and citations omitted). Since the court has found for Mr. Cedeno on the design defect claim, Ms. Cedeno's derivative claim for loss of consortium has survived. However, any damages she recovers will be reduced by thirty percent to account for the contributory fault assigned to Mr. Cedeno. See Maidman v. Stagg, 441 N.Y.S.2d 711, 716 (2d Dep't 1981) ("The damages recoverable . . . by the injured spouse and the consortium plaintiff will be reduced in the proportion that the injured spouse's 'culpable conduct bears to the culpable conduct which caused the damages.'").

      "The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more." Millington v. Se. Elevator Co., 239 N.E.2d 897, 899 (N.Y. 1968). The cause of action for loss of consortium "represents the interest of the injured party's spouse in the continuance of a healthy and happy marital life" and "seeks to compensate for the injury to that relationship." Id. at 900. An award for loss of consortium may include components for both the past and the future. Rangolan v. Cty. of Nassau, 370 F. 3d 239, 248 (2d Cir. 2004).

      The court has surveyed cases awarding damages for loss of consortium, including the following: Glassman-Brown, 2015 WL 5853802, at *6 (awarding $10,000 for loss of consortium where spouse of the injured party experienced an adverse change in his marital life for "several months" due to wife's diminished capacity to perform household chores, perform activities of daily living, play golf with him, and engage in an intimate physical relationship with him); Dockery, 663 F. Supp. 2d at 126 (awarding $40,000 ($47,834.73 adjusted for inflation) for

loss of consortium where the wife of the injured party testified to diminished social life, sleep loss, and lack of intimacy as a result of her husband's injury); Goldstein v. United States, 9 F. Supp. 2d 175, 193-94 (E.D.N.Y. 1998) (awarding $50,000 for loss of consortium ($78,698.77 adjusted for inflation) on the grounds that such a sum "balances the lack of quality leisure time the Goldsteins shared prior to the accident with the recognition of the many domestic chores Francine Goldstein did, but can longer do, to keep the house, and the many benefits that Allan Goldstein derived from those pre-accident efforts"); Battista v. United States, 889 F. Supp. 716, 729 (S.D.N.Y. 1995) (awarding $10,000 ($16,834.51 adjusted for inflation) for loss of consortium where the wife of the injured party cared for her husband in the first four months following his accident, but neither party testified that their love and affection for each other had diminished after the accident, nor did they expend any money to have household chores performed).

At trial, Ms. Cedeno testified that she took on significant caregiving responsibilities for her husband in the months following his accident, and that his lack of intimacy and increased irritability during that time negatively impacted their marital relationship. She also testified that her relationship with her husband has largely returned to normal, save for some increased irritability on his part, which may or may not have to do with his injury. Taking into account Ms. Cedeno's testimony, and the above cited cases, I value Ms. Cedeno's damages for loss of consortium at $30,000. After reducing that figure by thirty percent to account for comparative fault, I award Ms. Cedeno $21,000.

## CONCLUSION

For the reasons stated above, the court finds in favor of Mr. Cedeno on the design defect claim in the amount of $900,000, representing $500,000 for past pain and suffering and

$400,000 for future pain and suffering, and Ms. Cedeno on the loss of consortium claim in the amount of $30,000. However, plaintiffs' respective damages are reduced by thirty percent to account for comparative fault, resulting in an award of $630,000 to Mr. Cedeno and $21,000 to Ms. Cedeno, for a total of $651,000 plus post-judgment interest at the federal statutory rate.[16]

SO ORDERED.

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
       September 30, 2019

---

[16] See Cappiello v. ICD Publ'ns, 720 F.3d 109, 112 (2d Cir. 2013) (holding that federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions).